The third case for argument is 23-2656 from the District of Southern Iowa. Christopher Drew v. City of Des Moines et al. May it please the Court, Counsel. I am Adam Watosky, and I represent the appellant Christopher Drew. I have reserved five minutes for rebuttal. Christopher Drew had been standing in the doorway of his apartment for 23 seconds when Des Moines Police Officer Jason Hempstead pepper-sprayed him without warning, directly in the eye from eight inches away. He was so close that part of the stream ricocheted off and hit Officer Jordan Ulan, who was standing two feet away. Unknown to Chris was why these officers were even at his door. They had not knocked or announced their presence when he had opened his door to let a woman he had been arguing with inside his apartment leave. At no point did they tell him that they had a report that he had been harassing a female neighbor or that they were intending to arrest him based on that report. Isn't it the objective officer here that we look at what the officers knew? Yes. We do look at that. And they knew all that stuff. They did know that. But I believe that this all plays into the analysis as to whether Chris's actions posed a threat to the officers. I'm sorry. No, go ahead. I keep coming into a big problem with the way that this case sets in and lays in here on appeal. And maybe I just have missed it, but the District Judge, Judge Pratt, speaks over and over again about what the body camera footage showed and what findings of fact that he was making as a result of what he was able to observe. And as far as I can tell, the body camera footage was played in open court and received, but it was never received into evidence as an exhibit. So it's not anywhere in the District Court record, and it's nowhere in the record on appeal. And so we have these findings of fact in which the judge is dependent upon the video where he says, I saw this and I saw that, and this is what was said when. And he's got that laid out there in his specific findings. And now the burden's on you to show that those findings of fact are clearly erroneous. And I really can't see how I'm supposed to weigh this. I just think the evidentiary record somehow is messed up in a way that I can't review what the District Judge actually reviewed. And so where did that exhibit go, and why isn't it in the record? Your Honor, this is the first I've heard of that I've learned of this issue, because I know that the video was submitted as part of the appellee's appendix in support of their motion for summary judgment. I know that there was some issue at the time of hearing with getting it to play in the courtroom. But I know that a copy of it was provided, I believe, it was electronically submitted and provided on a USB. Provided to? Provided to the District Court in advance of hearing, because I know it was played at this court. Yeah, the transcript shows it was played in open court. Now, we can't find, I mean, I cannot find it. I can't find it. Couldn't find it in the district record at all. And so, you know, like I said, I mean, I'm looking at your, you know, you've got a big heavy burden because it's clear error on the fact-finding first, right? Now, it is 23 seconds, so that stands for something. Whatever happened, happened very quickly. But we do have Judge Pratt's description, and we don't have it. Now, you say it is somewhere in the district court record. It's just not properly indexed? Your Honor, that would be my assumption. I don't know for sure, because like I said, this is the first time I've heard that. Counsel, was it an exhibit? Was it as an exhibit? It was. Exhibits are typically in Federal court and State court given back to counsel. I know that it was submitted, that it was submitted as part of the documents that the appellee was relying on in support of its motion for summary judgment. They provided it. Was it called an exhibit? I bet it was called an exhibit, even in summary judgment. They're typically called exhibits. Okay. I can't recall how it was titled, Your Honor. It is the appellant's responsibility. I understand, Your Honor. But to that end, I would say that the district court's viewing of the video, because our position is that the general nature of the facts are not in dispute. It is how those facts are to be viewed with the inferences, with any inferences awarded to. So are you saying you don't quarrel? I know I'm cutting in the middle of your sentence, but for a reason. Are you saying you really don't quarrel with any fact-finding by the district court? Any of the facts found? We don't disagree with the finding of facts, though we do disagree with the Court's interpretation of Christopher Jew's initial outburst after being touched by Officer Hempstead. It is our position that, in that circumstance, that his statement must be viewed as it is an ambiguous statement. The inference has to be given to Christopher Drew in that circumstance. Right. But the problem we've got, of course, is that ordinarily, if there's a video, if the video clearly contradicts, then we can say that, like, and we've got the judge saying that no dispute touched him on the shoulder, no dispute on the words that were spoken, but the inference the judge drew was that the words that were spoken were spoken in a hostile and threatening manner. Yes. And you're saying that that inference is improper on the record before the Court here? Yes, and I think that that is supported by the Tolan case from the Supreme Court, where there was a similar statement in regard to, you know, stop touching my mother by a suspect, and the Court found that that statement was ambiguous as to whether it was a threat to the officers or just a demand to, you know, leave his mother alone. And I think that's what we have in this situation. Did he have a video? Did Tolan have a video? Tolan, I don't – I do not believe Tolan had a video. I do not believe Tolan did, but many other Supreme Court cases have had videos. Yes. That's where they developed the blatantly contradicted rule. Go ahead. Yes. So, all of a sudden, I – because I don't believe that the facts aren't themselves at issue, just the inference has to be drawn from them, at the end of the day, it's Christopher Drew was seeking – was seeking to figure out why the officers were there and why Officer Hempstead had reached through his doorway to grab his arm in the first place. And you can see that because, as the appellees concede, immediately after the initial outburst, he calmed down. He was the one trying to de-escalate the situation from that point on, where after his outburst, you have Officer Hempstead drawing his pepper spray, challenging by saying, is that right? Counsel, now you left out that the officer told him to turn around and put his hands behind his back. This is the district court. Drew did not comply. That is true, Your Honor, but – Those four words, Drew did not comply. That is true. He did not comply. And instead, he was verbally noncompliant. He – Well, no, he's also physically didn't turn around and put his hands. That's not just verbal. Go ahead. That's true, but that is – I don't believe that that reaches the level of active resistance. He is standing there still. He is trying to converse with the officer, and I believe that this is similar to the was angrily arguing, was told, you know, put your hands on the rack so I can handcuff you or I'll pepper spray you. The argument continued, and he was sprayed. In this situation, it is conceded that there was no physical action by Christopher Drew that would have – that was interpreted as threatening. It was just the initial outburst. Well, we're just assuming that that wasn't a threat, right? I think he said, if you touch me again, we're going to have a blankety-blank hard time or something along those lines. And here the officers were intending on arresting him. I understand your client didn't know why, but the officers were told if you basically – and the reasonable officer would say, if we try to arrest him, things are going to go down. He told us so. Why isn't that enough? Because you have to look at the immediacy of the threat. Well, they're going to arrest him, right? And they control when that happens. The immediacy of a threat is a question of timing, not contingency. As was said in Taylor – Well, your argument is because they had this conditional threat, they should have walked away. A reasonable officer should have said, no, we're not going to arrest him now. We're going to wait until later. No, I'm not even going that far. What I'm saying is, is that as Officer Hempstead conceded, there was an opportunity to de-escalate the situation. They could have taken a beat, said, hey, Chris, we had this report. If you can step into the hallway so we can talk with you. They could ultimately arrest him. They could ultimately say, hey, if you don't turn around, we're going to have to use force. But there was nothing that was immediate that posed a threat. It was, if you touch me again, well, you can attempt to talk to him to avoid that. You can tell him why you're there. You don't jump from the, please don't touch me, to pepper spraying him from eight inches away, ten inches under what he'd been trained was safe. Well, but there seems to be some evidence that there was an out-of-control situation when the officers arrived, right? Because we have the tenant who has escaped the building and is standing outside and makes a report that she confirms the dispatcher's ultimate report to the officers is correct. You've got the landlord who says, I'm in the process of evicting this dude. He's nothing but troubles all the time, right? You've got the woman escaping from what appears to be a loud and boisterous conversation going on inside the building without anybody ever knocking on the door. She wants locks changed, you know? I mean, and now we have a posture that the officers have testified is threatening and the judge, having seen the video, says he's threatening. How are we supposed to put, like, put that all in context and still say the right answer is, would you please step out? After they ask him, would you please turn around? And we're going to handcuff him and he refuses to turn around and put his hands behind his back. Your Honor, once again, I fall back to the timing of things. Officer Hempstead concedes that he could have de-escalated the situation. He could have stepped back. He could have done those things. And as to the, as you pointed out, the victim of the harassment was four stories down on the other side of the fence outside the building. There was no threat to her. The argument that the officer showed up for, they had no concern about that. They let that woman leave without any attempt to identify her or to assess that situation. They allowed two witnesses to just hang out in the hallway during this situation. The only person that Hempstead even suggests that Christopher Drew was a threat to was him. And Officer Hempstead was in control that would have controlled when or if that situation would have become physical. At this point, I would like to reserve the rest of my time for rebuttal. Thank you, counsel. Mr. Harrelson. May it please the Court, counsel. I'm John Harrelson, and I represent the officers in the City of Des Moines in this matter. The Court has highlighted some of the things, but there were 13 particular items that you can denote from the Court's order and also the various factual statements that the parties agree on. Thirteen items that these officers knew at the time they climbed those stairs. One, that the woman, what we're going to call S.C., was outside having reported that she was threatened by Mr. Drew. Second, that well, that Mr. Drew had at one point recently held her back while she was holding her one-year-old child. Three, Mr. Drew had threatened that he was going to F this place up. I know we just had a thing of intellectual property law. I'm willing to concede that that probably isn't a common domain. Four, he grabbed S.C.'s arm. Five, he was trying to get into her apartment in the past. Six, that he was blocking her exit from the apartment. Seven, that he had threatened to blow the apartment up. Eight, he ordered S.C. He entered S.C.'s apartment without permission. Nine, the manager stated that there had been repeated calls to the police about Mr. Drew's conduct with female tenants. Ten, another female tenant had claimed harassment. Eleven, he had recently broken a door of a female tenant. Breyer. Busted in. You said harassment. Busted in her door. Go ahead. He had harassed her, but he also had broken a door of a female tenant, whether it's the same one or the third. Busted into. Right. The district court's words. Go ahead. He had then, as the Court can notice from the order, when they arrived at the apartment, some loud discussion was going inside. As Officer Hempstead was about to knock on the door, the door opens. A woman rushes out of the apartment, thanks them. They claim she thanked Mr. Drew. I think from the video it's apparent she's thanking them for getting out of her way so she can get out of there. And as she departs the stairs in front of the two officers, she, he threatens her that if she ever comes back to his apartment, there's going to be a problem. And, of course, there was a misogynist statement in there as well, in front of the officers. Then a few seconds later, as Officer Hempstead tries to call Mr. Drew by placing his hand lightly on his shoulder, he tells him if he. And he asked if he has drugs or guns. He did ask if he had drugs or guns. And Mr. Drew said, if you touch me one more time, there's going to be a problem. So all those things happen. And those are the things that the officers have seen. They know the crime that they're there to investigate. They have made a determination he is going to be arrested. The crime that they're investigating was making physical threats to women. And he does it right in front of them, seconds before the incident that we have all sued about. So all those things are present to Officer Hempstead at the time. And the standard is not, well, he should have de-escalated, he should have backed back, he should have talked to that woman who was leaving. These are all classic things that are prohibited by Graham 2020 hindsight. This is a situation that Officer Hempstead said, I could have de-escalated, I suppose, theoretically, but at that point, based on his behavior, I thought we were going to have a fight. And obviously, the stakes of a physical confrontation involving laying hands and throwing punches and tackling are such that actually it's a greater physical threat to the officers and to Mr. Drew than using pepper spray, when Mr. Drew is in his door, in the public area, making threats. What are we to make of Hempstead's testimony where he told Eulen that he would pepper spray people who he thought may fight with him because he was too old and too fat to fight with people? I mean, that is not exactly the kind of police statements we like to see in a record. Well, in every theoretical construct or factual construct, there are always things that we go back and say, well, I wish that hadn't have been said or that seems extreme. But at the end of the day, it's extraneous. What matters is the evidence that was before him to take the action he did. And if one of those things in the calculus is, I am not going to fight the guy because that seems what he wants to do when I'm there to arrest him. So he took the alternative path of using pepper spray. So, again, this is 2020 hindsight that's prohibited by Graham. What matters is what was available to Officer Hempstead at the time and whether the choice he made was reasonable, not the most reasonable, but whether it was reasonable based on the information he had. And Mr. Drew had made repeated threats to him and to the females, and that was the thing he was there to investigate. So him making the decision that rather than try to get in a fight with Mr. Drew or giving Mr. Drew a chance to shut the door because he would have that opportunity, they took action to arrest Mr. Drew because when Mr. Drew was told to turn around and put his hands behind his back, no, they didn't say we're going to arrest you, but that seems to be a pretty clear indication when a police officer in uniform tells you turn around and put your hands behind your back, I think universally we can understand I'm being arrested. And Mr. Drew chose that moment to say no. What about the passage where the district court says, you know, a fair warning is necessary under the established case law, bottom page 14 of the opinion? Right. And I believe that says — Let me finish. Sorry. That's the premise. But he says yet here on the totality of the circumstances, despite the lack of warning, we're going to proceed. What do you do about the fact of the lack of warning and what the district court said about what was established on that date? I think it goes into the court precedent that we have on when warnings are necessary. And that falls into the cases like Thompson v. Monticello, Tatum v. Robinson, Brown v. City of Golden Valley. Those were nonviolent misdemeanors who were not a threat, had made no threat to officers, but Mr. Drew was not such an individual. He had made open threats to a woman right in front of him, the crime they're there to investigate. It's not every day that the police officer literally gets to see the individual violating the law that he's there to investigate. And much more, unlike these other cases, a crime that involves threats to injure, which is what he did. You know, we have a line of cases where they talk about warning, and they talk about the warnings being different in cases where the warning required in a lethal force case, the warning required in the less than lethal and possibly lethal force case, you know, the beanbag kind of thing from short range. And the cases that talk about nonlethal force, right? And in this spectrum, this would be nonlethal force. If you have a person who's not apparently law-abiding, is there, in fact, a duty to warn in that case? Or nonlethal force? I think that if you look at cases like Tatum, which was, again, a nonviolent misdemeanant, or maybe the case in the Eighth Circuit that probably started the line, which was Brown v. Golden Valley, that if it's a nonviolent misdemeanant that's nonresistant and poses no threat to the officers or others that they know of, in other words, not just, and I think, I don't think Mr. Drew qualifies under any of those three things, then it's clearly established that there should be some sort of warning and resistance to go to even nonlethal force if possible. But what we have here is the opposite of that. All three things are not present here. We have a serious misdemeanor that involves violence or threats to violence. We have a person who does not comply. And we have one who has posed a threat to officers or others because he's literally threatened someone else and the officer within a few seconds of each other. So I think that it could be argued, and I think it probably is, clearly established that nonviolent, nonthreatening misdemeanants that aren't resistant shouldn't be pepper-sprayed. But there's been no case law that says that an individual who threatens violence who is noncompliant and may pose a threat to officers cannot be pepper-sprayed. And that's what happened here. Is a case still going on in Polk County on this? Yeah. The Court, it's — there's two levels of State claims that are also made. There's a State constitutional claim, but there are also State common law claims. Yes, correct. Correct. What's the status of that case in a sentence or two? It's still — it's pending. It hasn't been scheduled for trial at this point, but we've made a motion to — both sides have made a motion to schedule. So it's still pending. I should say something quickly about the cases that the plaintiff relies upon. I think the Tolling case from the Supreme Court, and it's true, I didn't address that in my brief, but the Tolling case is a lot different than this case. That was a case where officers driving around made a mistaken identity of a license plate, therefore believing that the car that the person was — that the two kids were driving may have been stolen. They get involved in a fracas. The people who own the property, the parents of one of the children, come out. They're 15 to 20 feet away. They're upset that their child is being interrogated this way because, after all, it turns out he hasn't done anything wrong. And that devolves to the point where, despite no threats of violence, but people who are upset that the police are there, from 15 to 20 feet away, people end up getting shot by the officers. Not pepper sprayed from six — from eight inches away, but shot three times. So I think there's a huge factual distinction. But the district court and the circuit court ruled for the officers. Right. The Supreme Court said, no, we believe the testimony of them. What about — what about the other video cases from the Supreme Court? You appear to know these kind of cases. Well, yeah. What about the other video cases? This is a video case without a video. What do you think the video is? Well, I have to say that, as an aside, I believe both sides did put all the relevant video, both officers' body cameras, in total, into their appendices in the district court level. I know we did. I believe the plaintiff did as well. I didn't come here today expecting that question, but I believe that's the status of the case. I know there was discussion — I think you can click on something on the — you know what the — PACER, I think you call it PACER, whatever you call it. Yeah. You think you can click on something there and find the video, huh? You know, well, no. I don't know that. I know that both sides sent video as part of the appendix to the district court. But you didn't do anything in this Court like that? I — I didn't prepare the appendix, but I — You have the right to prepare your own, counsel. I do have a right to prepare a separate appendix. I guess my assumption was that that video made it up here. But that was an assumption that I made. But you're happy, of course, with the facts found in the district court. Yes, but I — Including the facts about the video. Right. Interesting infinite regress, but proceed. Yeah. And if the video is available, I believe that the video would accurately show what the district court found. And the status of case law is, is that if there's a dispute about facts, courts can look at the video. And, of course, even if there isn't a dispute about facts, courts can look at the video. And if the video clearly settles the question, the court can rely on the video as opposed to the arguments of the parties in determining whether or not something is a disputed fact. And that's what the Court did here. It made this determination based on the video evidence it was able to review from the officer's body cameras that Officer Hempstead's use of force in this case was reasonable given the facts and circumstances present to him at that time. And that being the case, it — I think the standard is, is that when the — that the court — this court is supposed to give deference to the fact finding on video of the district court unless the district court is shown to be 100 percent wrong. I'll concede that seems a little hard to do if you don't have the video. But the — but important in this case doesn't seem to be a particular fact about anything else but the particular decision that Hempstead used to make pepper spray in that instance. Of course, the problem is, is that we start off in a world in which we're on a motion stage. No one's really supposed to be making those sorts of findings of fact unless it's clearly contradicted by the video. Now we say the judge says it's clearly contradicted by the video, but we don't have the video in front of us. But usually we do have the video in front of us. And then we say, well, you know, that fact finding has to be clearly erroneous. And now we're like, are we supposed to apply clear error still even if the video is not there? And if so, what in the world could constitute clear error on that type of finding? Well, I think — I think what you have, then, is the use of the facts that you have in evidence that the parties don't dispute, that we know is there, that there had been threats made in front of the officers, made to the officers in a short period of time to a non — to an individual that is not complying to the officer's request to turn around and put his hands behind his back, says no. So to the factual situation that was faced in that officer and why he made that decision is testified to, that they questioned with 20-20 hindsight, but the court did not from that testimony, and he was deposed in this case, and his statements were part of the statement of facts. Counsel, yes or no question? Does the video include the statements by the woman leaving the apartment, the body camera? Yes. She would have been captured on video. Oh, yes.  Thank you. So thank you for your time. If there's no further questions, I'll reserve it to our other side to explain. Thank you. Mr. Rotovsky. Thank you, Your Honor. Picking up with the woman who was — who was leaving. She is on the video. Christopher Drew opens — opens the door, lets her out. She says thank you to him while she — as she's passing him. She says thank you to the officer. She says please let me leave to Officer Ulan, who is standing in the doorway. She leaves. Neither Hempstead nor Ulan say a single word to her or attempt to identify her. Yeah, but she makes the crib comment. That's what I was referring to. Yes. Yeah. No, he makes the crib comment. I said the crib comment. He made — yes. Christopher Drew, the quote that he says to her after she has — after she has already gone down the stairwell is, B, if you ever — if you ever come back to my crib, that is — that is what he says. And I would note that not only was she gone, but the — there's a body of case along the Eighth Circuit that — that recognizes that the passage of mere seconds is enough to resolve the immediacy of a threat. And in those cases — and in many of those cases, those situations where the suspect has a firearm, this is not a situation where Christopher — where what we are looking at here in the assessment of a threat is a single outburst that he immediately calmed down from, and it is conceded that he had immediately calmed down from. When you look — the sticking point here seems — when it comes to Tatum and Peterson and the other — and other authority is the nature of the offense — the nature of the offense at issue. But the — but the law is clear that you cannot — that you cannot use force as punishment based on the — based on the nature of the offense. The nature of the offense has to — has to inform — has to be informed by whether the degree of force is necessary to effectuate the interest of the — of the arrest. And in this situation, we don't believe that the facts support that. And I would note that the Shannon v. Kohler case is a situation where you have — where you have an intoxicated individual in the presence of women that an officer was told he had — that he had — that he had physically grabbed in a situation where he was mere inches from the officer. The question is whether he had touched that officer. And the Court found that the use — that the use of a takedown maneuver on him was excessive. So I believe that this case falls within those circumstances of these preexisting cases. I thank you, Your Honors, and we would ask that the district court be reversed. Thank you for the argument. Thank you, both counsel, for the argument. Case No. 23-2656 is submitted for decision by the Court.